UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| TODD AUSTIN HOGAN, | Case No. 1:12-cv-00295-EJL |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| vs. | |
| CORRECTIONAL MEDICAL SERVICES (CMS), DR. ALICE DAWSON, DR. GARRETT, LORNA HUFFMAN, KATHLEEN NIEKO R.N., JAN EPP, JOHN DOE #1, | |
| Defendants. | |

Pending before the Court in this prisoner civil rights action is a Motion to Dismiss filed by Defendants April Dawson, M.D., and Kathy Niecko. (Dkt. 17.) Plaintiff has filed a Response, and Defendants have filed a Reply. (Dkts. 20, 21.)

Having fully reviewed the record, the Court finds that the parties have adequately presented the facts and legal arguments in the briefs and record and that the decisional process would not be significantly aided by oral argument. Therefore, the Court will decide this matter on the written motions, briefs and record without oral argument. D. Idaho L. Civ. R. 7.1(d). Accordingly, the Court enters the following Order.

**MEMORANDUM DECISION AND ORDER - 1**

## REVIEW OF DEFENDANTS' MOTION TO DISMISS

Defendants assert that many of the claims in Plaintiff's Complaint are subject to dismissal with prejudice because his claims were filed beyond the statute of limitations period. Defendants argue that the remaining claims were not properly exhausted through the prison's administrative grievance process before this action was filed, and are subject to dismissal without prejudice. Defendants also assert that Plaintiff's state law claims should be dismissed for failure to follow the statutory prerequisites for bringing medical malpractice claims. The Court will consider each argument.

## 1.    Background

Plaintiff alleges that Defendants Dr. Dawson and Ms. Niecko provided medical care for his shoulder injury in a deliberately indifferent manner between 2004 and 2012, while Plaintiff was imprisoned at the Idaho State Correctional Institution (ISCI). Plaintiff's Complaint was notarized and filed on June 12, 2012. (Dkt. 3.) Earlier in this action, Judge Bush required Plaintiff to specify which acts complained of occurred within the statute of limitation period and to specify whether Plaintiff believed any grounds for equitable tolling existed. In response, Plaintiff filed an Amended Complaint and an Affidavit. (Dkts. 10, 11.)

In 2004, Plaintiff was experiencing shoulder dislocation and pain. (Plaintiff Aff., Dkt. 10-1, p. 3.) He repeatedly complained to Dr. Dawson in 2004, but alleges that Dr. Dawson told him nothing could be done to fix his shoulder or alleviate his pain, and she prescribed only Ibuprofen and an extra pillow. She allegedly ignored his complaints of

shoulder dislocation, and told him to "learn to live with it." (Plaintiff Aff., Dkt. 11, pp. 3-4.)

Plaintiff attempted to live with the pain for the next few years, but his dislocations became more frequent and the pain became severe and chronic. (Plaintiff Aff., p. 5.) In 2008, his shoulder pain became almost unbearable and his shoulder dislocations were so frequent that he had to tie his right arm across his chest to keep it from dislocating as he slept. (*Id*., p. 5.)

In 2008, Dr. Dawson allegedly told Plaintiff that nothing could be done for his shoulder, and she did not see the need for an extra pillow. (*Id*., pp. 5-6.) Plaintiff filed a grievance form, asking to see an orthopedic specialist for his shoulder. He noted that his shoulder constantly hurt, and pointed out the fact that many injuries are not obvious from an x-ray. (Zortman Aff., Ex. D, Dkt. 17-5, pp. 2-3.) He stated that if he did not receive a referral, he would file a lawsuit. Ms. Niecko responded to the grievance by stating that the x-ray was normal, and he would not receive an orthopedic visit or an extra pillow. (Zortman Aff., Ex. D, Dkt. 17-5, p. 3.) Ms. Niecko said, however, that Plaintiff would be scheduled for a second opinion with another prison doctor, Dr. Garrett. (*Id*.) Plaintiff's grievance appeal was denied by Jan Epp. (Dkt. 17-5, p. 3.) Plaintiff alleges that instead of asking Dr. Garrett, a prison doctor, for a second opinion in 2008, Ms. Niecko should have sent Plaintiff to an orthopedist. (*Id.*, pp. 6-7.)

In 2009, Plaintiff states that his shoulder would become dislocated simply by reaching out to pick up a glass of water or putting on a shirt. (Plaintiff Aff., Dkt. 11, p. 9.)

As a result, he got only a couple of hours of sleep each night. (*Id*., p. 10.) In 2009, Dr. Dawson allegedly performed only a superficial examination on Plaintiff and referred him to physical therapy. (*Id*., p.10.)

In 2009 or 2010, Plaintiff saw a physical therapist. Plaintiff was not able to do even the most basic exercises, and the physical therapist allegedly told Plaintiff that his shoulder appeared severely atrophied and had all of the indicators of a seriously unstable shoulder. (*Id*., p. 10.)

On March 16, 2010, Plaintiff was examined by an orthopedic specialist, Dr. Gustavel, who recommended surgery to reconstruct Plaintiff's shoulder. Plaintiff alleges that Dr. Gusvael said that an x-ray of Plaintiff's shoulder showed that it was *not* normal. Plaintiff received the surgery three months later, on June 11, 2010. (*Id*., pp. 10-11.)

On August 22, 2010, Plaintiff filed a grievance, complaining of the inadequate medical care received prior to his surgery, and also inadequate care received after the surgery. On August 26, 2010, the grievance coordinator returned the grievance to Plaintiff, showing; "As stated in your [2008] grievance, that has already been grieved []. Any further action on this issue needs to be through the legal process." (Zortman Aff., Dkt. 17-2, p. 6; Dkt. 20-1, p. 2.)

Plaintiff filed this lawsuit nearly two years later, on June 12, 2012. (Dkt. 3.) He sued Correctional Medical Services (CMS, now Corizon), Dr. Alice (April) Dawson, Dr. Garrett, Lorna Huffman, Kathleen Niecko, and Jan Epp. He was permitted to proceed on his Amended Complaint against Dr. Dawson, Kathleen Niecko, and Jan Epp. (Dkt. 10,

13.) To date, only Dr. Dawson and Ms. Niecko have been served.

## 2. Statute of Limitations Defense

### A. *Standard of Law*

Federal civil rights actions arising in Idaho are governed by a two-year statute of limitations. *See Wilson v. Garcia*, 471 U.S. 261 (1985) (later overruled only as to claims brought under the Securities Exchange Act of 1934, not applicable here); Idaho Code § 5-219. The statute of limitations is tolled while the inmate exhausts administrative grievance procedures pursuant to the Prison Litigation Reform Act (PLRA). *Brown v. Valoff*, 422 F.3d 926, 943 (9th Cir. 2005).

Because Plaintiff has asserted several different reasons to explain why he should be permitted to maintain his claims for inadequate medical care beginning in 2004 in a lawsuit filed in 2012, the Court will review several different legal theories that may serve to render those claims timely.

### (1) Accrual - Discovery Rule

Although the state statute of limitations governs the time period for filing a claim, federal law governs when a claim accrues. *Elliott v. City of Union City*, 25 F.3d 800, 801-02 (9th Cir. 1994). The Ninth Circuit has determined that a claim accrues when the plaintiff knows, or should know, of the injury that is the basis of the cause of action. *See Kimes v. Stone*, 84 F.3d 1121, 1128 (9th Cir. 1996). Under this "discovery rule," the statute begins to run once a plaintiff knows of his injury and its cause. *Gibson v. United States*, 781 F.2d 1334, 1344 (9th Cir. 1986).

In medical cases, it is often difficult for a patient to "discover" his injury when being treated by a physician upon whom he is relying for expert opinions and care.

In *Augustine v. United States*, 704 F.2d 1074 (9th Cir. 1983), in the context of an FTCA claim, the court explained that a patient must know or have reason to know both the existence and the cause of the injury:

> When a physician's failure to diagnose, treat, or warn a patient results in the development of a more serious medical problem than that which previously existed, identification of both the injury and its cause may be more difficult for a patient than if affirmative conduct by a doctor inflicts a new injury. Where a claim of medical malpractice is based on the failure to diagnose or treat a pre-existing condition, the injury is not the mere undetected existence of the medical problem at the time the physician failed to diagnose or treat the patient or the mere continuance of that same undiagnosed problem in substantially the same state. Rather, the injury is the development of the problem into a more serious condition which poses greater danger to the patient or which requires more extensive treatment. In this type of case, it is only when the patient becomes aware or through the exercise of reasonable diligence should have become aware of the development of a pre-existing problem into a more serious condition that his cause of action can be said to have accrued.

*Id*. at 1078.

(2)     Continuing Violation Doctrine

The continuing violation doctrine can be applied in § 1983 actions. *See Gutowsky v. County of Placer*, 108 F.3d 256, 259 (9th Cir. 1997). In *Gutowsky*, the plaintiff alleged that the county had an ongoing policy of discrimination throughout her many years of employment there, and she pointed to specific examples of discrimination outside the statute of limitations period that were "not the basis of her charge of discrimination" but rather were "but evidence that a policy of discrimination pervaded [her employer's] personnel decisions." *Id.* at 260. The court determined that her claim was timely filed, because "Gutowsky contend[ed] that the widespread policy and practices of discrimination of which she complain[ed] continued every day of her employment, including days that fall within the limitation period." *Id.*

Since *Gutowsky*, the law has been narrowed and clarified. *See RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045 (9th Cir. 2002). In general, it is no longer true, as in *Gutowsky*, that "if a discriminatory act took place within the limitations period and that act was 'related and similar to' acts that took place outside the limitations period, all the related acts—including the earlier acts—were actionable as part of a continuing violation." *RK Ventures*, 307 F.3d at 1061.[1]

---

[1] The Ninth Circuit Court recognized that one of the only remaining viable pathways to maintaining a cause of action for past acts occurring outside the statute of limitations period would be where a party's claims are *not* based upon discrete acts, but instead on "a series of separate acts that collectively constitute one unlawful practice," such as in a hostile work environment claim. *RK Ventures*, 307 F.3d at 1061 n.13 (internal citation and punctuation omitted). *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) ("Hostile environment claims are different in kind from discrete acts." ), discussed below.

More recently, in *Pouncil v. Tilton*, 704 F. 3d 568, 581–83 (9th Cir. 2012), the United States Court of Appeals for the Ninth Circuit further clarified that the date a cause of action accrues is determined by analyzing whether the plaintiff is suing for a defendant's discrete act that occurred *within* the statute of limitations period, allowing a plaintiff to proceed on the claim; or merely for an *inevitable consequence* that occurred within the statute of limitations period as a result of a discrete act that occurred *outside* the statute of limitations period, which prevents a plaintiff from proceeding. 704 F.3d at 576–79.

*Pouncil* relied on *Delaware State College v. Ricks*, 449 U.S. 250 (1980), which concluded that a college professor's challenge to the termination of his tenure accrued when he received a 1974 letter informing him that he would be terminated as of the end of the 1975 school year, and not when the actual termination occurred in 1975.

The *Ricks* theory of accrual was applied in *Knox v. Davis*, 260 F.3d 1009, 1014 (9th Cir. 2001), where the court held that an attorney's claim that her legal mail and visitation rights to prison inmates accrued when she received a letter informing her of such on January 20, 1996, and not when she continued to receive denials of those rights up until she filed suit in 1997.

In *Knox*, the Ninth Circuit Court refused to apply the continuing violation doctrine to permit Knox to proceed on her claims outside the statute of limitations, reasoning:

> [T]his court has repeatedly held that a "mere 'continuing impact from past violations is not actionable.'" *Grimes v. City and County of San Francisco*, 951 F.2d 236, 238–39 (9th Cir.1991); *Williams*, 665 F.2d at 924 (quoting

> *Reed v. Lockheed Aircraft Corp.*, 613 F.2d 757, 760 (9th Cir.1980));
> *Abramson v. University of Hawaii*, 594 F.2d 202, 209 (9th Cir.1979) ("The
> proper focus is upon the time of the discriminatory acts, not upon the time
> at which the consequences of the acts became most painful."). Knox's cause
> of action accrued when she received Tristan's permanent and complete
> suspension letter on January 20, 1996. The continuing violation doctrine is
> inapplicable because Knox has failed to establish that a new violation
> occurs each time she is denied her visitation or mail privileges. Rather, the
> CDC's subsequent and repeated denials of Knox's privileges with her
> clients is merely the continuing effect of the original suspension.

*Id.* at 1013. *Cf. Ngo v. Woodford*, 539 F.3d 1108, 1109-10 (9th Cir. 2008) (context of

determining expiration of time period for administrative exhaustion).[2]

Both *RK Ventures* and *Pouncil* examined *National R.R. Passenger Corp. v.

Morgan*, 536 U.S. 101 (2002), where the United States Supreme Court held that, while

the continuing violation theory could be applied to a hostile work environment claim "so

long as all acts which constitute the claim are part of the same unlawful employment

practice and at least one act falls within the time period," the same was not true of a claim

arising from discrete discriminatory or retaliatory acts. *Id.* at 122. Rather, "discrete acts

that fall within the statutory time period do not make timely [other] acts that fall outside

the time period." *Id.* at 111-12. The *Morgan* opinion relied in part on *Bazemore v. Friday*,

478 U.S. 385 (1986), "a pattern-or-practice case," where, in "considering a discriminatory

salary structure, the Court noted that, although the salary discrimination began prior to the

---

[2] In *Ngo*, the prisoner was notified on December 22, 2000, that he was barred from participating in special
prison programs. Relying on *Knox*, the court rejected Ngo's argument that the December 22 order
resulted in a continuing denial of his constitutional rights, so that the 15-day administrative exhaustion
period re-started each day that he was unable to participate in prison special programs. 539 F.3d at 1109-
10. Rather, the court held that the December 22 order gave Ngo "ample notice" that he would be barred
from special programs. *Id.*

date that the act was actionable under Title VII, "[e]ach week's paycheck that deliver[ed] less to a black than to a similarly situated white is a wrong actionable under Title VII." *Id*. at 395. In *Cherosky v. Henderson*, 330 F.3d 1243 (9th Cir. 2003), the Ninth Circuit Court explained: "*Morgan* makes clear that claims based on discrete acts are only timely where such acts occurred within the limitations period." *Id*. at 1246.

In summary, the present status of the law is that the United States Supreme Court has narrowed application of the continuing violation doctrine in a series of employment discrimination cases, and those holdings can be analogized to other civil rights contexts. A comparison of these cases sometimes leads to the conclusion that "the line between continuing violations that arise with each new use of the discriminatory act and past violations with present effects is subtle at best"; nevertheless, "it is a line the Supreme Court has drawn, and it is our obligation to apply it if at all possible." *Leffman v. Sprint Corp.*, 481 F.3d 428 (6th Cir. 2007) (parentheticals omitted). The overarching principle that can be derived from the direction of these cases on the continuing violation doctrine is that federal district courts should carefully consider which alleged violations constitute discrete acts and when they occurred.

(3)    Equitable Estoppel

If a claimant cannot show that his claim accrued during the statute of limitation period, he still may file a lawsuit beyond the statute of limitation deadline if he can show that his statute of limitation should have been tolled (or stopped) for a certain period of time during the deadline period within which he should have filed the lawsuit. In a civil rights case such as this, state tolling provisions apply unless important federal policy will be undermined. *See Johnson v. Railway Express Agency, Inc*., 421 U.S. 454, 464-65 (1975).

The Idaho Supreme Court has determined that "[s]tatutes of limitation in Idaho are not tolled by judicial construction but rather by the expressed language of the statute." *Wilhelm v. Frampton*, 158 P.3d 310, 312 (Idaho 2007). Idaho statutorily tolls the limitations period for a person's minority status or insanity. I.C. § 5-230.

The theory of equitable estoppel is also available. While it "does not 'extend' a statute of limitation," it works in a similar manner to prevent a party who has falsely represented or concealed a material fact with actual or constructive knowledge of the truth "from pleading and utilizing the statute of limitations as a bar, although the time limit of the statute may have already run." *J.R. Simplot Co., v. Chemetics International, Inc*., 887 P.2d 1039, 1041 (Idaho 1994).

Equitable estoppel requires a showing of four elements: "(1) a false representation or concealment of a material fact with actual or constructive knowledge of the truth; (2) that the party asserting estoppel did not know or could not discover the truth; (3) that the

false representation or concealment was made with the intent that it be relied upon; and (4) that the person to whom the representation was made, or from whom the facts were concealed, relied and acted upon the representation or concealment to his prejudice." *Id*. at 1041.

## B. *Discussion*

### (1) Accrual Based on Discovery Rule

The Court has reviewed the facts from several different angles under the federal "discovery rule," and yet can find no construction of the facts that would render Plaintiff's pre-surgery claims timely. Plaintiff's 2008 grievance makes it clear that (1) he himself believed the full extent of his shoulder injury would not appear on an x-ray, contrary to Defendants' representations, and (2) he knew that he could file a lawsuit if Defendants refused to send him to an orthopedic specialist. (Dkt. 20-1, p. 4.) Even if there were evidence that Defendants intended to mislead him by telling him his x-rays were "normal" and nothing could be done to solve his shoulder dislocation problems, Plaintiff was not, in fact, misled, because he was aware that his injury had worsened and that an orthopedic appointment and other testing could lead to resolution of the problem. Thus, Plaintiff's claims accrued on June 19, 2008, when Plaintiff had notice of the refusal of Defendants to provide any different care for his shoulder problems, and his lawsuit should have been filed no later than June 19, 2010.

Even under a more liberal construction, assuming that Plaintiff could not have discovered facts supporting his cause of action in 2008 or 2009, the Court concludes that

Plaintiff discovered facts necessary to proceed with a lawsuit on March 16, 2010, when the orthopedic surgeon told him that his shoulder x-ray was not normal and recommended surgery to correct the dislocation problem. That is, on March 16, 2010, Plaintiff knew that Defendants had been wrong, and he had two years from that date to file a civil rights lawsuit that would reach back into time to cover Defendants' earlier acts.

Permitting Plaintiff to take advantage of tolling during the time it took to exhaust his administrative remedies, a four-day period from August 22 to August 26, 2010, would cause the end of the two-year statute of limitations period to be extended from March 16, 2012, to March 20, 2012. Plaintiff filed his lawsuit on June 12, 2012, several months too late for any claims that accrued as of March 16, 2010.

(2)    <u>Accrual Based on Continuing Tort Theory; Exhaustion of Administrative Remedies</u>

Another theory that Plaintiff seeks to take advantage of is the continuing violation doctrine. Plaintiff argues that "he could not have filed suit until after his surgery by Dr. Gustavel in 2010, because he could not have known the damage caused by the Defendants when the[y] refused to treat him in a timely manner, until after the results of the surgery were known." (Dkt. 20, p. 9.) Plaintiff alleges that Defendants Ms. Niecko and Dr. Dawson "effectively block[ed] the plaintiff from discovering the true extent of his injury," because they told him his x-rays were normal and they refused to let him see a specialist. (*Id*., p. 4.) However, as noted above, in 2008, Plaintiff believed that the full extent of his injury would not appear on an x-ray, and he knew that he could file a lawsuit

if they refused to send him to an orthopedic specialist. (Dkt. 20-1, p. 4.) He made a clear demand for adequate treatment and received a clear rejection in the 2008 grievance.

As of 2008, Plaintiff's claims stood in the same procedural posture as *Ricks*, *Knox*, and *Ngo*. When a plaintiff receives notice of a governmental decision that will inflict damage, the cause of action accrues. It does not accrue later, simply because further injury is suffered. In addition, the extent of a plaintiff's injury need not be known to trigger the start of the statute of limitations period. Rather, a plaintiff need know only that he was damaged and the cause of the damage. *See Abramson v. University of Hawaii*, 594 F.2d at 209 ("The proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful.")

After Plaintiff decided he could not live with the shoulder problem and again began seeking care for his worsened condition from Dr. Dawson in 2009 or 2010, Dr. Dawson newly referred Plaintiff to physical therapy. After the physical therapist noted a serious problem with Plaintiff's shoulder, Plaintiff was referred to an orthopedic specialist in March 2010. Dr. Dawson's decision to take new and different action in Plaintiff's case is another discrete act. This act was not merely a continuation of prior care, but new care undertaken separately and anew from Dr. Dawson's previous determination that nothing further would be done and no orthopedic consultation would be scheduled.

Even if the Court permitted Plaintiff to use a continuing tort theory to render timely all of the care that he received from Dr. Dawson from 2004 to March 16, 2010, when he was made aware of his injury and who caused it, he still did not file his lawsuit

within the two-year statute of limitations. There was a clear break in any "continuing tort" allegedly inflicted by Dr. Dawson and Ms. Niecko when Plaintiff was referred to an orthopedic surgeon.

The surgery, which occurred on June 12, 2010, did *not* give Plaintiff his first notice that Defendants had wrongfully told him his shoulder was normal; rather, it simply corrected the problem and cannot be said to have been the date Plaintiff "discovered" that Defendants allegedly violated his constitutional rights.

Further, that Dr. Dawson and Ms. Niecko allegedly failed to follow post-operative orders from Dr. Gustavel and did not properly follow up to see that Plaintiff received proper physical therapy are also new, discrete acts that occurred after repair of the injury that was caused by the failure to refer Plaintiff to an orthopedic specialist in 2008. *See Pouncil*, 704 F.3d at 578-79 ("*Morgan* instructs that a court must determine whether a claim is based on an independently wrongful discrete act, and if it is, then the claim accrues, and the statute of limitations begins to run, from the date of that discrete act, even if there was a prior, related past act.").

Plaintiff further argues that the prison's rejection of his August 22, 2010 grievance – based on the reasoning that it was an issue encompassed by the 2008 grievance – shows that Defendants viewed the medical treatment provided for his shoulder as one continuous course of treatment, for which he should be able to maintain a lawsuit filed at this late date. Plaintiff wrote the following in his August 2010 grievance:

> From 2004 to 2010 CMS providers knew of and failed to provide me

with the adequate standard of care in regards to my repeated shoulder dislocations and ongoing pain. Despite knowing of this problem and prior medical history, I was refused a referral to an orthopedic specialist. I even filed a grievance on this issue in 2008 as a consequence of this neglect. I suffered severe deterioration of my shoulder and needed surgery. Since my surgery CMS has refused to send me to a first follow-up appointment with my orthopedic surgeon. Instead opting to take x-rays of their own and sending them to be read by someone other than my orthopedic surgeon.

(Dkt. 20-1, p. 7.)

On August 26, 2010, the grievance coordinator returned the grievance to Plaintiff, showing; "As stated in your [2008] grievance[,] that has already been grieved []. Any further action on this issue needs to be through the legal process." (Zortman Aff., Dkt. 17-2, p. 6; Dkt. 20-1, p. 2.)

The Court disagrees with Plaintiff that the 2010 grievance response re-opens the statute-of-limitations door to sue for the discrete acts that Plaintiff grieved in 2008. The 2010 grievance response merely states that nothing more can be done within the administrative grievance process. It did not guarantee him the right to pursue a legal action where such legal action would be blocked by a procedural defect, such as the statute of limitations.

However, the Court does agree with Plaintiff that, because his 2010 grievance was rejected as to his notification that CMS had failed to provide a timely after-surgery orthopedic surgeon follow-up appointment in 2010,  the grievance procedures were effectively unavailable to him, and, thus, he has satisfied 42 U.S.C. §1997(e), the exhaustion requirement, for claims arising from a failure of Defendants to authorize

Plaintiff to be taken to a timely follow-up appointment with the orthopedic surgeon. *See Brown v. Valoff*, 422 F.3d 926, 936 (9th Cir. 2005).

(3)     Equitable Tolling

Plaintiff alleges that, by the actions set forth above, Dr. Dawson and Ms. Niecko attempted to conceal his injury, and that their statements were false. He alleges that they told him the x-rays were normal, and Dr. Gustavel said that the x-rays were not normal. However, Plaintiff has not demonstrated that the x-rays Defendants viewed were the same x-rays that Dr. Gustavel viewed. Plaintiff's own Affidavit showed that his shoulder condition worsened between 2008 and 2010; thus, x-rays may have revealed a worsened condition.

Rather, the record shows that Defendants informed Plaintiff that they did not believe his condition warranted further care. Plaintiff then made a choice to follow a conservative path of treatment, rather than to file suit to attempt to resolve the problem. Defendants did not thereafter ignore Plaintiff's reports that his condition had worsened, but they referred Plaintiff to another prison doctor, a physical therapist, and then, finally, an orthopedic specialist. Plaintiff has not brought forward sufficient evidence to show fraud or intentional concealment on this set of facts. Similarly, nothing in the record shows that Defendants attempted to dissuade Plaintiff from pursuing legal action in 2008 when he threatened to do so.

Finally, even if Defendants purposely misled Plaintiff so that he would not demand additional medical care, Plaintiff knew that their representations had been wrong as of

March 16, 2010, when he saw Dr. Gustavel for the first time. Equity further requires Plaintiff to act diligently, which he did not, having waited to file his lawsuit until two years after he had surgery.

Because the most generous application of tolling would extend the statute of limitations only to March 20, 2012, Plaintiff's filing of June 12, 2012, was still untimely.

(4)     State Law Claims

Defendants also request dismissal of Plaintiff's state law claims on statute of limitations grounds. (Dkt. 17, pp. 1-2.) In Idaho, accrual of a claim for personal injuries is governed by the following rules:

> An action to recover damages for [personal injury or] "professional malpractice" must be commenced within two years after the cause of action has accrued. Idaho Code §§ 5-201 & 5-219 (1998). Except for actions based upon leaving a foreign object in a person's body or where the fact of damage has been fraudulently and knowingly concealed, the cause of action . . . accrues "as of the time of the occurrence, act or omission complained of," Idaho Code § 5-219 (1998), although there must also be some damage for the cause of action to accrue. *Griggs v. Nash*, 116 Idaho 228, 775 P.2d 120 (1989). The limitation period is not extended by reason of any continuing consequences or damages resulting from the malpractice or any continuing professional or commercial relationship between the injured party and the alleged wrongdoer. Idaho Code § 5-219 (1998).

*Lapham v. Stewart*, 51 P.3d 396, 399-400 (Idaho 2002).

The extensive analysis above would be the same under this state law standard, because the latest date Plaintiff discovered any alleged concealment of his condition and damage was March 16, 2010. As a result, the Court concludes that Plaintiff's state law claims are barred, other than the post-surgery claims, because Plaintiff knew of his claims

as of March 16, 2010, but did not file his lawsuit until June 12, 2012.

**C.**     *Conclusion*

Based on the foregoing analysis, Plaintiff has not shown that his claims against Defendants are timely, with the exception of a failure of Defendants to authorize Plaintiff to be taken to a timely after-surgery follow-up appointment with the orthopedic surgeon. Therefore, Plaintiff may proceed only on the latter claims for acts of Defendants that occurred after June 12, 2010.

**3.     Defense of Failure to Complete PLSP Process as to State Law Claims**

Defendants argue that, because Plaintiff failed to complete the pre-litigation screening process before filing his lawsuit, he should be barred from pursuing his claims. Pursuant to Idaho Code § 6-1001, Plaintiff is required to participate in a prelitigation screening hearing before an Idaho Board of Medicine panel. The purpose of the panel is to review the Plaintiff's evidence and provide the panel's comments and observations regarding the merits of the medical malpractice claim. *James v. Buck*, 727 P.2d 1136, 1137 (1986). The proceedings are "informal and non-binding, but nonetheless compulsory as a condition precedent to litigation." I.C. § 6-1001.

The Idaho Supreme Court has determined that filing a proceeding with the prelitigation screening panel is not a condition precedent to filing a complaint in district court. *Moss v. Bjornson,* 765 P.2d 676, 678 (1988). The *Moss* decision also held that it was not an abuse of discretion to stay the proceedings in state court until the screening panel issued its advisory opinion. *Id.* at 678. The statute provides a stay of thirty days

after the panel issues its comments and observations. I.C. § 6-1006. The reason for the stay is to allow the parties time to consider an informal resolution of the medical malpractice claim before litigation on the claim commences. I.C. § 6-1005.

Therefore, dismissal is not required, and Plaintiff may seek a stay of this action (as to post-June 12, 2010 claims) if he has not completed the prelitigation screening process. Defendants are free to raise this defense at a later date if Plaintiff has not now completed the process, or does not complete the process in a timely manner.

## ORDER

**IT IS ORDERED:**

1. Defendants' Motion to Dismiss (Dkt. 17) is GRANTED in part as to Plaintiff's claims, with the exception of a claim based on failure of Defendants to authorize Plaintiff to be taken to a timely post-surgery follow-up appointment with the orthopedic surgeon. If Plaintiff determines that he has insufficient or marginal evidence to prove that any injuries or damages were caused by the delay in scheduling the orthopedic follow-up appointment (Defendants assert that a follow-up visit was scheduled eventually), Plaintiff may wish to discuss a stipulated dismissal of his remaining claims with Defendants on whatever terms the parties can agree. Plaintiff may proceed on this limited claim only, with the scope of this action (including discovery), limited to that topic and time period.

2.     **Disclosure of Relevant Information and Documents:** If the parties have not already done so, no later than 30 days after entry of this Order, the parties shall provide each other with relevant information and documents pertaining to the claims and defenses in this case, including the names of individuals likely to have discoverable information, along with the subject of the information, as well as any relevant documents in their possession, in a redacted form if necessary for security or privilege purposes; and, if necessary, they shall provide a security/privilege log sufficiently describing any undisclosed relevant documents which are alleged to be subject to nondisclosure. Any party may request that the Court conduct an in camera review of withheld documents or information. In camera documents are to be filed ex parte under seal, and not provided by email or mail.

3.     **Service**. All un-served Defendants must be served no later than **60 days** after entry of this Order, or claims against them will be dismissed.

4.     **Amendment of Complaint**. Any proposed amended complaints, with accompanying motions, must be filed no later than **90 days** after entry of this Order.

5.     **Completion of Discovery and Requests for Subpoenas:** All discovery shall be completed no later than **180 days** after entry of this Order. Discovery requests must be made far enough in advance to allow *completion* of the discovery in accordance with the applicable federal rules

*prior* to this discovery cut-off date. Discovery is exchanged between parties, not filed with the Court. The Court is not involved in discovery unless the parties are unable to work out their differences between themselves as to whether the discovery responses are appropriate. In addition, all requests for subpoenas duces tecum (pretrial production of documents by nonparties) must be made within **150 days** afer entry of this Order. No requests for subpoenas duces tecum will be entertained after that date. (Subpoena requests for trial appearances of witnesses shall not be filed until the case is se for trial.) To obtain a subpoena duces tecum for production of documents by nonparties, Plaintiff must first submit to the Court the names, addresses, and the type of information sought from each person or entity to be subpoenaed, and Plaintiff must explain the relevance of the items requested to the claims. The Court will then determine whether the subpoenas should issue.

6.      **Depositions**: Depositions, if any, shall be completed no later than **150 days after entry of this Order**. If Defendants wish to take the deposition of Plaintiff or other witnesses who are incarcerated, leave to do so is hereby granted. Any such depositions shall be preceded by **10 days'** written notice to all parties and deponents. The parties and counsel shall be professional and courteous to one another during the depositions. The court reporter, who is not a representative of Defendants, will be present to record all of

the words spoken by Plaintiff (or other deponent), counsel, and any other

persons at the deposition. If Plaintiff (or another deponent) wishes to ensure

that the court reporter did not make mistakes in transcribing the deposition

into a written form, then Plaintiff can request the opportunity to read and

sign the deposition, noting any discrepancies between what is transcribed

and what Plaintiff believes was said. If Plaintiff wishes to take depositions,

Plaintiff must file a motion requesting permission to do so, specifically

showing the ability to comply with the applicable Federal Rules of Civil

Procedure by providing the names of the proposed persons to be deposed,

the name and address of the court reporter who will take the deposition, the

estimated cost for the court reporter's time and the recording, and the

source of funds for payment of the cost.

7.   **Dispositive Motions:** All motions for summary judgment and other

potentially dispositive motions shall be filed with accompanying briefs no

later than **210 days after entry of this Order**. Responsive briefs to such

motions shall be filed within **30 days** after service of motions. Reply briefs,

if any, shall be filed within **14 days** after service of responses. All motions,

responses, and replies shall conform to Rule 7.1 of the Local Rules for the

District of Idaho**. Neither party shall file supplemental responses,**

**replies, affidavits, or other filings not authorized by the Local Rules**

**without prior leave of Court. No motion or memorandum, typed or**

**handwritten, shall exceed 20 pages in length.**

8.      <u>**Alternative Dispute Resolution (ADR)**</u>. Should Plaintiff and any

Defendant wish to attend a settlement conference, they should file a

stipulation to attend settlement conference, and the case shall then be

referred to the Court's ADR Director.

DATED:  **March 4, 2014**

Honorable Edward J. Lodge
U. S. District Judge